Case number 23-55, Asante et al. at balance versus Xavier Becerra in his official capacity, Secretary, Department of Health and Human Services et al. Mr. Johnson for the at-balance, Ms. Neumeister for the at-lease. Good morning, counsel. Mr. Johnson, please proceed when you're ready. Good morning. May it please the court. Initially, I would like to emphasize two important points that may not be obvious in the papers. The first point is that all hospitals lose money when they treat Medicaid patients. We know this because from 1965, which is when the Medicaid Act was enacted, to 1980, all hospitals were paid on the same basis, which was 100% of their actual cost. Then the federal government abandoned cost-based reimbursement in 1980 by adopting the Boren Amendment. States had the ability to pay hospitals much less than their actual costs. These facts have two important implications for the application of the Commerce Clause here. First, there is no profit to be made here. There are no willing sellers in a free marketplace. As a result, there is no logic here to the application of the Market Participant Exception to the Commerce Clause because there is no free market. Second, this case is not about the flow of Medi-Cal patients. Instead, it is about the flow of all patients. By not having equality in the Medi-Cal payments, California is putting out-of-state hospitals at a competitive disadvantage vis-a-vis in-state hospitals for all patients. The second important— The market participant doctrine just depends on whether the government is acting as a regulator. It does not depend on what the profit margins are. Well, there has to be a free marketplace. There has to be a demand curve and a supply curve. In this case, the state simply sets by fiat the price and there are no willing sellers because what seller would ever participate in a marketplace where they cannot make any money? The second point I would like to make is a statutory regulatory one, which is that federal law has always required parity in payments between in-state and out-of-state hospitals. Obviously, all hospitals, both in-state and out-of-state, were paid on the same basis from 1965 to 1980, which was cost-based reimbursement. Then, when the federal government abandoned cost-based reimbursement, the respondents themselves changed the language in Section 431.52 to ensure continued parity in payments between in-state and out-of-state hospitals. This means this court does not need to look beyond the federal statutes and regulations to decide this case. Let me explain these points in a little bit more detail. Can I just ask you as a framing question? Am I right in understanding that the amount that the out-of-state facilities get is different depending on whether you would prevail under constitutional claims as opposed to your claim under the regulation? In other words, that's not right? The relief would be the same, which would be to invalidate the state plan amendment and to force the state to go back and develop a plan that takes into account out-of-state hospitals. I take that point. If the relief is invalidating or avoiding the plan, that's going to be the same. In terms of your theory about what you're owed, if the program were extended to your facilities, it seems like the amounts that would be coming to your facilities are less under the regulation than under the constitutional claims. Under the regulation, by its terms, it's limited to certain subcategories of services that are provided to Medi-Cal patients. It's needed because of a medical emergency. It's the four specific types of services that are defined in subsection 3 of the regulation. Yes, Your Honor. The out-of-state hospitals cannot even treat a Medi-Cal patient unless that patient falls into one of those four categories because they wouldn't be qualified to treat those patients. Is that true? I thought, they won't get payment unless they fall into one of those four categories. They won't get payment at all? Not at all. They don't get the QIF subsidy, but doesn't the patient carry Medi-Cal with them wherever they go? So whoever provides them services, they would get a check. Well, first off, you're right. Because of EMTALA, the hospital must treat, under those circumstances, the patient. Whether or not the hospital gets paid depends upon how the state of California reviews the claim. If they say it doesn't fall within any of these four categories, they're not going to pay it at all. Is there supplemental payment through other state plans for all of the plaintiff states? No. What happens is every state pays for its own Medicaid patients. So I know the respondents made the claim that, well, we have these supplemental payment programs in other states. They would only pay for their own patients. California is responsible for paying supplemental payments for its Medi-Cal patients. So the payments have to come from the state in which the Medi-Cal patient resides. Right. Okay. I see what you're saying now. Under EMTALA, the services have to be provided. Whether Medicaid, I'll just use Medicaid now because the regulation starts with Medicaid, whether Medicaid pays depends on whether the interaction falls within one of these subcategories. Yes, sir. Yes. Okay. With respect to the market participant exception, I would direct the court to the case of Children's Hospital v. Bonta, 118 Cal Reporter Second 629. This is a California Medi-Cal case involving out-of-state hospitals in which there was a two-week trial followed by an appeal and a decision by Justice Klein. And in that decision, Justice Klein very succinctly outlined there are many reasons why the market participant exception does not apply. And he says, among other things, it's the Medi-Cal patient choosing the hospital, not the state. The state is not setting rates that are all responsive to market forces. The provision of Medicaid services is inherently unprofitable. Hospitals serve Medi-Cal patients only because they cannot legally refuse to do so. It's a very complete analysis. And you cannot have a market participation exemption when you have no willing sellers and you have no free marketplace. It simply doesn't make any sense. But there's another issue here that's also very important. And that is another issue that Justice Klein addressed in his decision, which is the article of commerce here we're talking about Medi-Cal patients, but the provision of care to all persons to whom a hospital can make it available. This is a very important point. No one really wants to treat Medicaid patients. They do it because they cannot legally refuse to do it. But what happens when the California hospitals keep all of the money and don't pay the out-of-state hospitals for the Medi-Cal patients are treating? It's putting those California hospitals at a competitive disadvantage vis-a-vis in-state hospitals in competing for all types of patients. And Justice Klein talks about that in his decision. But it sounds like you want to restructure the program because you're not paying the tax. You have the ability to do so and then get the subsidy and join the program just like the in-state programs. But that is not what these plaintiffs appear to want to do. Well, that is really a ruse. The whole statute that they passed followed the litigation that I participated in against the state of California 10 years ago. And we entered a settlement in which the out-of-state hospitals were paid QRAF monies. That settlement went on for 10 years. The state didn't like it. They wanted to get out of it. So one thing they did is they said, well, we're going to adopt this statute which says that out-of-state hospitals can participate just like in-state hospitals. The problem is if you use the same rules for out-of-state hospitals, they're going to lose between $100 and $300 million a year because their volumes are a lot lower than in-state hospitals. Everyone knew it was a ruse and that it wouldn't work. And CHA, in fact, said that in their declarations in the earlier case. But the other thing they did is they passed a statute which said the out-of-state hospitals can't even sue because if they sue the QRAF program and lose, then the court of appeal has to ignore that decision. So there's been one level of discrimination on top of another against the out-of-state hospitals. But what is equity to you then? The equity would be... That then doesn't somehow diminish what is going on with the in-state hospital. Well, we achieved equity in our settlement agreement that's been in effect for the last 10 years, which was that out-of-state hospitals were basically paid the same benefit that in-state hospitals received under the QRAF program. If you equalize the benefits, then everything's fine because all you really care about is the end result. You don't want to care about how you get there. And there's very easy ways in which the state could do that. But the state has refused not to use those mechanisms and to, in fact, totally deny out-of-state hospitals from getting any money. So can I just ask you about the regulatory argument, the argument under the regulation? Yes. So the regulation starts under subsection A and it's a statutory basis. Section 1902A16 of the legislation, as I understand it, relevant to this argument, authorizes the secretary to prescribe state plan requirements for furnishing Medicaid to state residents who are absent from the state. So I think I understand your argument if we construe the regulation to be about furnishing services to Medi-Cal beneficiaries because the QAF subsidy in some sense is tethered to the levels at which any facility, whether out-of-state or in-state, furnishes services to Medi-Cal recipients. But the way A is framed is it's furnishing Medicaid to state residents. And when I think about furnishing Medicaid to state residents, what I immediately think about is somebody who goes to the hospital, gets services, and then they would get a check from Medicaid to help them pay for the services. That's my insurance payment. But just as an accounting mechanism, instead of giving the money directly to me, which I used to pay for my bill, the money just goes directly to the provider. But it's an insurance payment to the patient under the words of A. It's furnishing Medicaid to state residents. But the QAF subsidies, they don't furnish Medicaid to state residents. They give money to hospitals and it's related to providing services to Medi-Cal recipients. But it's not furnishing Medicaid to state residents. And what's wrong about that? Well, what's wrong is the hospitals get the payment, not the patient. It's just like any other insurance carrier. It's true that the hospitals get the payment under QAF or the hospitals get the payment for... The in-state hospitals get the payments under QAF and they also get a payment for what's called an APR DRG. So they get two payments. They get the APR DRG payment and the QAF payment. I don't know the acronyms. You're much more steep in this than I am. But is the APR, did you say APR DRG? Yes. Is APR DRG, that's like a normal insurance payment, which is that... Right. So that one I get because with a normal insurance payment, it's one way to think about a normal insurance payment is it's money that goes to the patient. And then the patient can use that to pay the bill. But instead of doing it that way, the insurer just pays the provider directly. And then the provider then bills the patient less. Well, there's no provider payment here. I mean, typically not because you're talking about Medicaid, but yes, the hospital gets the payment. But let me make an important point here. There's a direct payment made based on what are called diagnosis-related groups to the hospital. In-state hospitals also receive a supplemental payment. Before my time goes away, I want to make a very important point here, which is the QAF payment is based upon the specific days of care that are provided. And if you look at the joint appendix 544, page 544, this is part of the state plan amendment at issue here. And page 544 lists the payments that would be paid to in-state hospitals for QAF. And you have, for example, a payment of $1,588 for each Medi-Cal general acute care day, $975 for each Medi-Cal acute psychiatric day, my point here is this, whether it is a direct payment, in other words, a DRG payment or a QAF payment, it is still based upon the volume of services provided. That I understand it's based on the volume of services provided. What I don't understand is even if it's helpful to point to that part of the appendix, but that it's still hard to conceive of that as furnishing Medicaid to state residents. Whereas the other one is normal. I'm covered by Blue Cross Blue Shield. When I go in and get care, Blue Cross Blue Shield could give me a check that then I could use to pay for the care. But instead what happens is I get the care, what I'm billed by the provider is less because they're going to get a check from Blue Cross Blue Shield. That's how I read A. But instead of Blue Cross Blue Shield, it's Medicaid. But that's not true of the QAF payment. It doesn't work that way. It's not meant to be in lieu of a payment that otherwise would go directly to the resident. The payments don't go to the residents. The payments go to the hospitals for Medicaid. I understand that, but I think, and we can ask the government about this too, the payments do go to the hospitals, but that's just, it's just sending the money directly to the provider instead of going through two steps where you'd send the money to the patient and the patient would use it to pay the provider. It's true that it goes directly to the provider in the same way that the QAF payment goes directly to the provider. I understand that, but it seems like on, for one of them, it's just as a matter of convenience, it goes to the provider. It's really what it is, is the payment to the insured by the insurer. Well, in both cases, the point that I would like to make is that whether it is a direct payment, an APR DRG payment, or a QAF payment, it is still based upon the volume of Medi-Cal services provided. And to that extent, and it's a very important point, to that extent, it is a payment for services. That I think is the strongest part of your argument under the regulation. It does appear to be understandable as a payment for services to Medi-Cal patients, payment for services provided by the provider to Medi-Cal patients. What it's a little harder to conceive of is that it's a Medicaid payment to the patient. It is true that the payment to the provider is pegged to the level of services provided to Medi-Cal patients, but it doesn't feel like it's just a substitute for a Medicaid payment to the patient, which is how I read A. And we can ask the government about whether that understanding is correct. Maybe that's totally off, but that is how I understood A, is it's talking about Medi-Cal as an insurance program that pays patients. I guess all I can say is that that's never been the way I've looked at it. So. Okay, then let me just ask you this. That's helpful. Do you consider the QAF program to constitute the furnishing of Medicaid to state residents? It's a payment toward the cost of the Medicaid services to, of course, they never get back all of their costs, but it is a payment that goes toward the cost of Medicaid services. I'm having a hard time understanding your distinction because it seems to be so. I may not be articulating it well. Maybe I may not be articulating it well. Maybe we can ask the government about whether there's this understanding is totally off, but I appreciate you're at least entertaining the question. Let me make sure my colleagues don't have additional questions for you at this time. Well, you did ask for your relief to be vacating all the QAF orders. So what's the effect of that? Well, the effect of that would be that the state would have to go back and devise some sort of program that would treat in-state, out-of-state hospitals and in-state hospitals so that they have the same end result. There's lots of different ways to get there. It's not up to me or to the court to devise those means, but if they redo it and don't get it right, then we just end up back here again. But certainly they have a variety of means that they use to accomplish that. We've accomplished that in the last 10 years because we've had a settlement agreement that everyone has been happy with. But you also have a case in the Ninth Circuit holding that the state of California's determination of its Medicaid reimbursement methodology is exempt from Dormant Commerce Clause restrictions. Well, yeah. We think that decision is simply wrong. That decision said that the market participant exception applies. It can't apply because there's no willing sellers. There's not a seller in the world who's going to sell something at less than cost, which is what happens always with Medicaid. And she said that, well, she said in response to the argument of EMTALA, she said, well, EMTALA applies across the board. Yes, that's true. It does apply across the board, but hospitals don't lose money when it applies with respect to all the other patients. They only lose money under EMTALA with respect to Medicaid patients. Medicaid patients are always losers. And that was my first point because it's very important here. It's important because it means that you can't have a free market if there are no willing sellers or providers of services. This is all done through compulsion and fiat. It has no attributes of a market. And just quickly going back to your formula where you say that this would equalize itself if they went back to the drawing board and came back up with this. Are you asking for you not paying the tax and just getting the subsidy or paying the tax and then getting the subsidy based on a different formula that is not only Medi-Cal days? Well, let me propose one solution, which I've already done in the papers before the trial court, which was the state of California currently pays something on the order of $40 million a year to public hospitals. They use quaff money to do it, federal quaff money. But CMS does not review that program. And according to respondents, there is no approval of that program by CMS. Therefore, it's not subject to any of the distribution rules that CMS would apply. If, for example, the state were to say, we're going to treat out-of-state hospitals, we're going to have to give them a special exception, just like we do to the public hospitals in California. And we're going to give them, say, $10 million a year allocated based upon the Medi-Cal days that they provide. Well, that would be very similar to what it currently does with respect to public hospitals. And there wouldn't be any problem with that because, according to the respondents, those public hospital monies are not subject to any of the CMS rules. By the same token, without any quaff fee, the state could remedy the problem just by treating them like they do the in-state public hospitals right now. But that's only one of many different ways it could be used, but it certainly can be done. This may be a different way of asking the same question, but is there a mootness problem here? This order before us governs the terms on which money was to have been spent between, I forget the years, but the term has expired. Presumably the money's been spent. Is there some legal obligation for California to repay money that's already been spent or automatically make adjustments in future plans? Well, we would hope they would adjust future plans. I mean, the only reason we're here, we're dealing with this FA that came into effect, I think, in 2020, 2021, and we filed a summary judgment motion on July 4th, 2020. I mean, shortly after that thing took effect. The problem was the trial court took 955 days to rule on the summary judgment motion. Maybe that's unfortunate. That's why we're here dealing with such a retroactive period that's so far in the past. It's because we were stymied for two and a half years in the trial court. And of course, the state and CMS, every two years, they would enact a new spot, but we can't keep up with that because the court schedule doesn't allow us, you know, once we sue under one, by the time we get to the court of appeal, there's a new one in effect, but in essence, they're all the same anyway. They're just changing the dates and the dollar amounts, but they're all structured the same. Okay. Maybe we'll hear from the government now. We'll give you a little time for rebuttal.  Ms. Neumeister. Thank you, your honor. May it please the court, McCain Neumeister on behalf of the government. The district court correctly upheld CMS approval of California's Medicaid plan amendments, and the plaintiff's equal protection and dormant commerce clause claims fail for the same fundamental reason. The plaintiffs aren't being burdened because they don't pay the quality assurance fee. This is a California tax levied on the state's own private in-state hospitals to fund a number of different in-state healthcare programs. The QAF subsidy at issue here is just one of them. By plaintiff's own account, if they were treated the same as in-state private hospitals that have to pay this tax, they would be significantly worse off paying millions, but receiving only a small proportion back in subsidies. But this makes them no different than many in-state hospitals that have the same result. All of this underscores that plaintiffs are not similarly situated to in-state hospitals for equal protection purposes, nor are they burdened for purpose of the dormant commerce clause. What plaintiffs really want isn't equal treatment, it's special treatment. They don't want to pay any in-state tax, but they want subsidies anyway. The constitution does not require this result. Finally, plaintiff's remaining claims fail for two independent reasons. First, the regulation at issue doesn't address subsidies at all. And second, as CMS has concluded for decades, this regulation is about coverage for services rather than base rates for services. Let's talk about that. Right. The regulation seems to be... So let's... Judge Srinivasan focused on A, which is the statutory authority. I want to focus on B, which is the substantive obligation. And at first glance, it seems to be an anti-discrimination provision about Medi-Cal beneficiaries, the class who receive treatment in California and the class who receive treatment somewhere else, right? And it requires... It says, shall pay for services furnished in another state to the same extent that it would pay for the beneficiary who gets treatment in-state, right? Yes. All right. So the prepositional phrase, to the same extent, what does that modify? It modifies pay, right? Shall pay to the same extent. We understand, Your Honor, the importance is to read the phrase as a whole. It's to pay for services furnished to the same extent. And in this context, read in light of the statute and the rest of this regulation, pay for services furnished refers to furnishing Medicaid. And so to the same extent in this context means that the scope of Medicaid coverage, the specific procedures that are covered by Medicaid for this beneficiary are the same in-state and out-of-state. If California has to cover a heart surgery for a patient in-state and they're permitted to go out of state under the regulation, heart surgery is also covered for that. Do you think it's a fair use of language to say beneficiary number one gets the heart transplant in a California hospital, beneficiary number two gets it in the border hospital, and the first hospital gets compensated $10,000 and the second one $500? Do you think it's a fair use of the English language to say that those hospitals have been paid for services furnished to the same extent? I do, Your Honor, and that's reading this regulation in the context of the rest. Let's start with the regulation. I'll let you go to context first, but let's start with text. Seems like you're running decidedly uphill just on this text. I think the fundamental thing to keep in mind when reading this text is that there is a separate statutory provision that addresses precisely the situation that Your Honor posited. That's the statutory provision at issue in the Armstrong case, that's A30A, which specifically provides that state plans must provide... I'm sorry, where are you? Sorry, I'll give you the full U.S. Code citation. It's 42 U.S.C. 1396A, A30A. And as I mentioned, this was a statute that the Supreme Court addressed in the Armstrong case. And this provides that state plans must provide for payments that are, quote, sufficient to enlist enough providers so that care and services are available under the plan, at least to the extent that such care and services are available to the general population in the geographic area. And this statutory requirement, which is implemented by other regulations in a different part of CFR, is specifically addressed to ensuring that these payments are sufficient so that if a beneficiary is entitled to receive services out of state, those services are being compensated at a level to ensure that they will be available. I'll study it in a second, but you're jumping two levels, right? You're jumping from the reg to the statute, and you're jumping from the directly controlling statutory provision, which is the one I was focused on, which is 16 rather than 30. So I'll get to 30. But you have anything else on just the text of the reg? So the text of this regulation, in using the entire phrase, pay for services furnished, is talking, that phrase essentially is a synonym for furnishing Medicaid, which is the reading of that regulation, if it's read in light of the governing statutory provision, which talks about furnishing medical assistance under the plan to a beneficiary, and it's confirmed by the other regulatory provisions here. As Judge Kronvossen was discussing subsection A of the regulation, just as furnishing Medicaid, subsection C talks about furnishing medical services. It's focused on the sort of furnishing  So A does use that phrase, and it was statutory authority, which is 16, which says furnishing medical assistance, right? But that's a defined term, and the statutory definition of medical assistance is it's one of two things. It's either providing the services directly, right? California can run the state hospital to do that, which is not at issue here, or payment of part or all of the cost of the care, and we're right back to payment. Well, we're back to finishing Medicaid. So to the extent that the statute permits of those two things, subsection A says that this regulation... We're back to furnishing medical assistance, the furnishing of medical assistance. Yes, Your Honor. Medical assistance is the defined term. Correct, Your Honor. And so the statute does that, and then the regulation opens with subsection A, which says the regulation is going to be implementing that statute and is implementing it with these requirements with respect to furnishing Medicaid, which is synonymous with furnishing insurance coverage for these beneficiaries. And then subsection B effectuates that by ensuring that when these beneficiaries travel out of state, if they meet certain conditions, they can receive that Medicaid coverage to the same extent they receive it in state. And as I mentioned, this is consistent with a reading of the statutory text. It's confirmed by these surrounding subsections of this regulation. It's confirmed by the rest of the Medicaid statute, as I mentioned, A30A, which is a specific requirement governing payments based on geographic location. A30A is implemented by different regulations, which are found in Part 447 of the CFR. Part 447 is titled Payments for Services. The regulation we have here... Can I ask a question this way? I don't want to interrupt a lot of questions, but... Well, give me a minute to work through 30, so I'll let you go. Yeah, I'm not at 30 yet. So on this, the regulation and the main statute 16, if I asked whether the QAF subsidy, which does involve Medicaid money, right? Yes, your honor. So if I asked whether that Medicaid money is being paid to a provider for finishing services to Medi-Cal recipients, I would think, yeah, maybe so. Because the way that Medicaid money is allocated to a provider is we figure out how much did that provider serve Medi-Cal patients. We count patient days, and we even do it by services. Then that determines the level of the QAF payment to a provider. So it does start to sound like it's a payment of Medicaid money to a provider for the furnishing of services to Medi-Cal recipients. It sounds like that. So I think as far as that goes, I can understand the challenger's argument. And under B, it does talk about payment for services furnished. And if you talk about payment for services furnished, it can be understood in a way that would encompass the QAF subsidy. What does the work in my mind is A's reference to furnishing Medicaid to state residents, because that makes it sound like it's only talking about the insurance component where it's actually providing money to a patient because of a particular procedure they got. And instead of just cutting the check to the patient, they just give the money directly to the provider. But it's as if you gave the money to the patient, and then the patient turned around and gave it to the provider. That's the way I'm thinking of it. I was causing a lot of confusion earlier, but am I understanding your position correctly or am I off? So I think that is one way to think about it, Your Honor, but I sort of want to situate where we are in our arguments. It's been CMS's longstanding position that this regulation does not create any kind of equal payment requirement. It's just about coverage. But the court doesn't have to reach that question if it says that regardless, whatever this actually means, it does not apply to these QAF subsidies. So the court doesn't have to definitively resolve whether there is a payment requirement. And so in that alternative where the court is narrowly saying QAF subsidies are not covered here, then I think what Your Honor is discussing with the meaning of furnishing payment and the fact that it's not really compensating covering insurance specifically by giving money to a beneficiary or giving it to the beneficiary by paying on their behalf, then I think that's another way to think about it. Yes. Another way to distinguish the scope of B. What we explained different from the position you wrote in your brief? I think they're compatible, Your Honor. What we explained in our brief is that to the extent this could... So your position was payment for services under B just means coverage. That is the agency's longstanding position, Your Honor. But we also explained that the court doesn't need to reach that because B does not cover subsidies in any event. I got this from your brief because maybe I actually quoted A. Yes. And so we... That's where I even thought of this is that you quoted A as the part of A that says furnishing Medicaid to state residents. Yeah. So I think this is compatible with what we explained in the brief, Your Honor. How is it different? So I'm not sure that the argument in the brief, the main argument in the brief, the CMS's longstanding position, why if it's... How did you describe what this regulation is about? The regulation is about the scope of coverage, Medicaid coverage for individuals when they go out of state. So this... Coverage to you means a service. The scope of insurance coverage that the state is... Or rather the scope of procedures for which the state has an obligation to cover them. Yes, the scope of... Whatever is going to happen to the patient. Yes, Your Honor. The scope of services. Coverage like you walk into a dentist's office, are you going to cover my tooth extraction? You do mean the procedure, but the lay person might mean, is the insurance going to pay for it? We mean that... We think coverage in the sense that California has to pay for these services, but it's about the scope of services they have to pay for and not the level of payment that's required. And so back to Judge FranRosten's question, our reading of B excludes subsidies because if anything, B is referring to payment for specific services furnished to a particular beneficiary under certain conditions. And so that's consistent with furnishing Medicaid. It's the concept of... It is, but why isn't it also consistent with the QAF subsidy payments? Because at some level, they go to providing specific services to Medi-Cal recipients. And is the part of the joint appendix that the opposing counsel referred to not a way that you calculate the level of the QAF subsidy? It is, Your Honor, but we read the state plan very differently. B is about specific services. QAF subsidies are not tied to specific services. And so if you look at the state Medicaid plan, that's JA 540 to 547, it contains several features that underscore that it is not tied to compensating providers for the cost of specific services. In particular... That's true. It's not... It doesn't say because you perform service X to patient Y on date Z. Here's the example we're going to give you, if that's what you mean. Yes, Your Honor. I get that, but I don't know why you have to... Why B has to be read that narrowly because it's still taking into account the type of service that's being provided, the number of days for which Medi-Cal recipients received payments. So it's pegged to the level of services and type of service to Medi-Cal recipients. But it's a very loose correlation, Your Honor, because it isn't really trying to compensate for specific services. It's trying to compensate hospitals to the extent they're valuable to this program. And so some of the important features of the plan to understand this disconnect is that many of these subsidies are based on Medi-Cal days from past years, not this year. California has already furnished Medicaid for those things. This is just using those numbers to estimate a hospital's continuing participation in the program. The plan also specifies that if hospital does not furnish any Medicaid within a quarter, it doesn't get any sub that quarter. The hospital did provide the services in 2016, but it's not going to get paid for them because it's not providing the services at present. Another example is the fact that these payments are made on a lump sum basis. I believe it's quarterly. They're not done as increases to current reimbursement. That's explained on the first page of the plan. But you could do them on a lump sum basis, and they could be a tabulation of all, of individual services. And then that argument, that's just an accounting question, right? It could, Your Honor, but this just underscores that in every way, this plan is structured so as not to be compensating for specific services. I guess what I'm not getting is when you say it's not compensating for specific services, what is compensating for specific services? In other words, what you think this covers, isn't that coterminous with the understanding that I'm getting from A? What's the difference? Because it seems like when you're saying it's only about compensating for specific services, what it means is it's the payments that would otherwise go to the patient for a specific service, but they're going to the provider for the specific service. I'm not disagreeing with you, Your Honor. In thinking about this argument, I wasn't bringing A to bear on my reading of B, but I think this is correct. A way to think about it is that to the extent B is talking about anything, it's talking about specific services where Medicaid is furnished to a beneficiary, but that's not what the QAF subsidies are doing. Then why are the two arguments different? They seem like they're the same argument. You said you could base it on the argument we've been focusing on our brief, which is CMS' longstanding understanding, or you could base it on A, which talks about the furnishing of Medicaid to state residents. Sounds to me like they just actually ultimately get to the same place, but maybe there's a difference there. I think there's an important difference, because even if you read B to be about specific payments for services, I don't necessarily think that they are different. However, we want to be very clear that CMS reads B as not creating a payment requirement for either base rates or the supplemental rates. I think that's the difference. We read B as being about coverage and focused on the rights and entitlements of the beneficiary, not creating any kind of equal payment requirement, even for base rates. I think that's the difference. That's CMS' longstanding position that this is coverage. This is not a payment requirement at all, but the court doesn't- CMS must provide that the state will pay for services furnished to the same extent that it would pay for services furnished. That seems like that's equalizing pay. And CMS has previously explained that that's not what it was doing in this regulation. There's the Mary Hitchcock case, which we cite in our briefs, where the agency laid out its position in that case. There's also an amicus brief that the government filed back in 1996, shortly after this regulation was enacted. That's cited in the Northern District of California case from 2015, which is cited, I believe, in plaintiff's briefing, which cites to the government's amicus brief from 1996, demonstrating that this is CMS' longstanding interpretation of this regulation. But ultimately, the court doesn't need to say definitively whether this is any kind of payment requirement because this does not cover the QAF subsidies and base payments are not at issue in this case. Then I guess I get back to Judge Katz's question, which is, if it's just about whether you're getting to the same services, regardless of the level of pay, then the level of pay could be dramatically different. But the government's position is that's still consistent with B? Yes, Your Honor, because B is not about the level of pay. That's not what this regulation is protecting. That scenario is being addressed in the separate statutory provision that I mentioned. That's 1936A.A.30A, which is enforced by CMS. CMS considers it, for instance, considered it in approving this plan here, whether or not that requirement was satisfied and found that it was. That is a statutory requirement with its own implementing regulations that are designed to 30 then because we've been talking about what I've called anti-discrimination provision, and you say it's about coverage. We're questioning whether it's about payment. 30 seems different. 30 seems like it's just a minimum floor requirement. It says that the plan has to provide sufficient payment as may be necessary to ensure a bunch of things like adequate quality of care for Medicaid patients. It doesn't really address the question of in-state versus out-of-state. Well, Your Honor, CMS understands it to apply to payments both in-state and out-of-state, but it's not creating necessarily parity requirements. But it just doesn't speak to the question of whether coverage and or payment needs to be the same when you have similarly situated Medicare beneficiaries and one gets treatment in-state and one gets treatment out-of-state. Yes, because the Medicaid statute and its implementing regulations do not contain that parity requirement. 16 speaks to the equal treatment requirement, whatever it is, pretty directly, and 30 just doesn't speak to it. I don't know why we would look to 30 to substantially change our reading of 16. Because, Your Honor, 30 is specifically about payments and the level that payments have to be set at in order to be adequate under the statute. And 30 is implemented by various regulations that can be found, as I mentioned earlier, in Part 447 of the CFR, which is titled Payments for Services. There are specific regulations there which cite A30A, explain that they're implementing A30A. If CMS were to create a parity and payment requirement, it would have created it in those regulations that specifically address payment. The regulation we're talking about here is found in the General Administrative Requirements section, and it's sandwiched between two other regulatory sections that are specifically about the entitlements of providers, about the fact that plans have to provide transportation to obtain services, that providers have a freedom of choice, a right to freedom of choice in selecting their providers. Those are the immediately surrounding provisions of 431.5.2, which just demonstrates further in context, this is not a payment provision. This is a coverage provision. So I guess what you're saying is the way CMS understands the regulation that's directly at issue is that even though it's got the word payment all over it, what it means is just any payment. What it's really about is you got to pay for services. Services is the key. Any payment for services, as long as it's for the same services, is enough, even if it's one cent. It doesn't set a minimum, Your Honor. Yes, there has to be. So in other words, as long as you're covering the same services, you could pay one cent as opposed to $10,000, and the regulation will be satisfied. There's a payment to the same extent. There's nothing that in 430.51 that speaks to the level of payment. It's the separate statutory provision, A30A, and all of its implementing regulations that do the work in ensuring that the payment an individual beneficiary can obtain out of state, rather, sorry, that the services they can obtain out of state are going to be available because the level of payment is going to be sufficient to ensure that they're available. So that work is done by A30A and tried to distinguish the supplemental payment as being less tethered to provision or payment for individual services than the base payment. But just looking at the state statute that authorizes this program, if I have it right, it says that the purpose of the and I'm paraphrasing here, but to improve funding for hospitals in serving the state's Medi-Cal beneficiaries. Sounds like it's about payment issues as to Medicaid. It's about compensating in-state hospitals extra to help ensure that they continue operating and available to serve beneficiaries and make sure that vulnerable populations within the state will continue to have access to care. So in a broad sense, it is. They can only obtain these payments if they are continuing to serve Medicaid beneficiaries. But they're not payments tied to specific services, which are the kinds of payments that subsection B, only kinds of payments subsection B could be read to apply to. I mean, they sort of are and they sort of aren't. I mean, the formula for the supplemental payment is mind numbingly complicated, has lots of variables, but one of them is volume of services provided. And one might say the same thing about the DRG calculation, which is the basis for the payment, as I understand it. And, you know, as well as I do, if you read the DRG statute, right, you'll get the same kind of, you know, God knows 50 input variables, one of which is volume of services. Yes, your honor. I think you've hit on something important, though. The state could have tied the QAF subsidies to the DRG, which would have at least tied it in the most of the same degree. It could have. Yes. The DRG is supposed to approximate the level of services that are being provided and compensate in relation to that estimated level. The state could have tried to tie the QAF to that so that it would be more directly compensating for the level of services as understood. But they didn't do that. They tied it to these general categories of different kinds of days without respect to the particular DRG of the patient, the services that were being provided on that day. Tethering is less direct, but it seems to me it's a question of degree. And your honor, even if that's the case, there are still the other elements of this program which demonstrate that the state is not tying it to specific payments. It's based on previous payment years. If a provider stops serving Medicaid beneficiaries, it won't get these payments, even if it did treat in previous years. One of these categories, I believe, or sorry, excuse me. Furthermore, they pay on this on some basis. They're not doing it as increases on particular payments. And so overall, it supports the state's explanation of the goals of this program, which are to support these hospitals and continue ensuring access to care. They're not attempting to just specifically compensate for the cost of particular services. Okay. If we thought that, or maybe if I thought that A was doing work in understanding the scope of B, et cetera, then is it right to say that what this regulation is supposed to be getting at, even if I don't talk about payment levels, is the thing that happens when a person goes into a hospital to get treated. And instead of the check going to them and then they pay the provider, the check goes directly to the provider. But that's the corpus of stuff that's being talked about. Now, whether you want to say that for that corpus of stuff, the level of payment has to be the same. I mean, in theory, you could bracket that and say, you know, the regulation either does or doesn't speak to that. But when you say that's the corpus of stuff that the regulation encompasses, that isn't what QAF is about. Yes. And I think that the court can resolve this issue by saying only that, that in this regulation, it's just about what your honor has just explained. The QAF is something separate. The court doesn't ultimately need to resolve one way or another what B is doing, whether it's a payment requirement or a coverage requirement. It's beside the point because this is only about furnishing Medicaid, those specific payments for services to the providers. And those are not at issue in this case. So they're the kind of payments to providers that are another way of paying the patient. Yes, that it's essentially what we what we refer to as like the base rates. It's essentially the base rate which is intended to reimburse for specific services that at the very least the regulation is only talking about that. It is not talking about any subsidies and supplemental payments, which is what we're talking about. Is that your understanding of why A speaks in terms of furnishing Medicaid to state residents? Because it's not talking about furnishing Medicaid to providers. It's talking about furnishing Medicaid to state residents. Yes, your honor. And that's consistent with the statute. A-16 also refers to furnishing medical assistance under the plan to beneficiaries. So we think that that is consistent with how the statute is framing this requirement. Okay, two final questions. One, is there any mootness or redressability issue in our hypothetically setting aside an expired plan? We have it. We don't think there is, your honor. In addition to vacatur and district court plaintiffs also mentioned other forms of relief. And as my friend on the other side noted, these plans are time limited and they ultimately can be replaced with another plan. My understanding is that there have been two subsequent plans approved since the programs at issue in this litigation. We don't see any problem with that. Last question on scope of relief. Just assume for the sake of argument, we would accept your friend's challenge on the statute. Conventional view would be, we set aside the agency action under review, which is approval of this plan. I'm sure you know, there's a lot of question on whether that's the right way of thinking about judicial review. And other option might be we provide as applied relief to the border hospitals who were the parties before us. Does the government have a preference or a view on which remedial approach would be better? It's not something that we've considered your honor. I'm not prepared to take a position on that. Okay. Do you have an understanding that there's a challenge here that the regulation is inconsistent with the statute? No, your honor. I don't, I don't believe that that's the challenge. Okay. Ultimately, when you were talking about the goals of the plan, is it to have this access to care or to have this reimbursement to the in-state hospitals? And the reason I asked for that is because the plaintiffs are suggesting that they're providing the care for your residents as long as they come within those particular categories. And so why shouldn't they have the opportunity for these subsidies? Well, your honor, this, this goes to the policy judgments of the state of California in structuring its program as a sort of an initial matter. All these hospitals are receiving compensation in the form of base rates for the services that they are providing. And California had the option of introducing an additional supplemental payment under Medicaid. And it determined that it was going to structure this program in a way that would support the hospitals that were most crucial to providing Medicaid access to in-state beneficiaries. And vast majority of in-state beneficiaries receive services from hospitals within the state of California. So the state structured its plan by limiting these subsidies to in-state hospitals in order to serve those goals. And again, that that's a line drawing question and exercise of the state's policy judgment that rational basis review simply isn't, isn't positioned to second-guess that. This is eminently reasonable for the state to structure the program this way to meet these goals. Thank you, counsel. Thank you, your honor. We ask this court to affirm. Mr. Johnson, we'll give you three minutes for rebuttal. I can do that pretty quickly, your honor. First, if you look again at JA 544, it's very, the respondent's counsel indicated that these payments were not based upon patient days, or they were based upon other years or whatever, but it's very clear that the payment changes every year. And so there's a connection between the amount of money a hospital's receiving and the amount of Medi-Cal days it's providing in a particular category in each year. There's a clear connection between the cloth payment and the service provided, number one. Number two, the court mentioned 30A. 30A is unenforceable. The decision that held that is Armstrong v. It's entirely irrelevant for purposes of our discussion. They're not trying to enforce it. They're just citing it as an interpretive consideration when we look at the 16 and its implementing regulation. Well, it has nothing to do with in-state versus out-of-state hospitals. It has to do with the minimum payment rate that the Supreme Court said can't be, there's no private right of action to is that if you look at the goals of the cloth program, it clearly relates to payment for services. It talks about improving funding, improving hospital reimbursement, increasing federal financial participation. Clearly the cloth program is designed to provide additional payment for services. There's no way that a hospital ever receives all of its costs back, but at least it's something. And one point I'd like to stress here, which is that we're not even talking about charity. Because if you look at Children's Hospital v. Bonta, again, Justice Klein's decision, we did an extensive analysis in that trial and we determined that out-of-state hospitals treat patients who are two to three times sicker than those treated by California hospitals. So what has California done? It said, even though these patients are three times sicker, we're going to entirely exclude you from receiving any share of the $4 billion in exclusively federal money, which we receive. And beyond that, it said, oh, by the way, you also can't sue us because here, look at this statute, which says you can't sue us. Oh, and by the way, we have a program for you here. We'll treat you just like in-state hospitals, but we all know that will result in losses of hundreds of millions of dollars. The state of California has done this for the last 25 years. And you can look back at all the cases, they all affirm that particular point. This court should overturn what the state has done and overturn CMS's approval for that particular reason. Okay. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Katsas, Childs